## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MAUREEN D. BOZICEVICH,                                    CIVIL No. 05-390 PAM/AJB

    PLAINTIFF,

v.                                                       REPORT AND RECOMMENDATION ON
                                                         THE PARTIES' CROSS-MOTIONS FOR
JO ANNE B. BARNHART, COMMISSIONER OF                      SUMMARY JUDGMENT
SOCIAL SECURITY,

    DEFENDANT.

---

Jennifer G. Mrozik, Attorney for Plaintiff Maureen D. Bozicevich

Lonnie F. Bryan, Assistant United States Attorney for the Commissioner

---

## I. INTRODUCTION

  Plaintiff Maureen D. Bozicevich (Bozicevich) disputes the unfavorable decision of the Commissioner of the Social Security Agency (Commissioner) denying her claim for a period of disability and disability insurance benefits under Title II of the Social Security Act.  This matter is before the court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the district court on the parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.  Based on the reasoning set forth below, this court **recommends** that Bozicevich's Motion for Summary Judgment [Docket No. 11] **be granted** and that the Commissioner's Motion for Summary Judgment [Docket No. 14] **be denied**.

## II. ISSUE BEFORE THE COURT

The issues before the court are (1) whether the Administrative Law Judge (ALJ) properly weighed the opinion of Bozicevich's treating physicians; (2) whether the ALJ applied the correct law in making a credibility determination regarding Bozicevich's subjective complaints; (3) whether the ALJ correctly developed the record with respect to Bozicevich's complaints of asthma; and (4) whether the ALJ posed the proper hypothetical to the vocational expert that included all of Bozicevich's limitations that were supported by substantial evidence.

### III.   PROCEDURAL HISTORY

Bozicevich filed an application for disability insurance benefits on December 11, 2001, alleging an inability to perform substantial gainful activity due to Guillain-Barré Syndrome (GBS),[1] chronic fatigue, and residual nerve damage as of April, 30, 1997, the alleged onset date.  (T. 60, 75.)  Her application was denied initially and on reconsideration.  (T. 25, 27.)  Pursuant to her request, Bozicevich was granted a hearing on February 4, 2003, before ALJ Mary M. Kunz.  ALJ Kunz issued her decision on March 18, 2003, denying benefits based on a finding that Bozicevich was able to perform her past relevant work.  (T. 22.)  The Appeals Council denied review rendering the ALJ's decision the final decision of the Commissioner.  (T. 7.)  Bozicevich filed an action in district court seeking judicial review of the Commissioner's decision.  The parties' cross motions for summary judgment are before the court.

### VI.   FACTUAL BACKGROUND AND MEDICAL HISTORY

---

[1]      Guillain-Barré Syndrome (GBS) is a disorder caused by nerve inflammation involving progressive muscle weakness or paralysis, which often follows an infectious illness.  *MedlinePlus Medical Encyclopedia* at http://www.nlm.nih.gov/medlineplus/encyclopedia.html.

Bozicevich was born on August 20, 1950, making her 52-years old at the time of the administrative hearing and 46-years old on the alleged onset date.[2]  Bozicevich is a high school graduate with additional vocational training in office management.  She stayed at home to raise her two children until 1992, when she began working as a church secretary at Hazel Park Congregational Church.  (T. 66.)  She worked as the church secretary through 1997, when she stopped working allegedly because of her inability to keep up with the demands of the job due to her fatigue caused by GBS.  (*Id.*)

A.      *Activities of Daily Living Questionnaires and Information for Friends*

Bozicevich explained that, prior to GBS, she had knee problems, but no balance or low energy problems, and was able to be involved in various activities, including volunteering at her children's school and at her church.  (T. 99.)  She also liked to go shopping with friends and her children, go out to dinner with her husband, and enjoy the birds in the woods.  (T. 116.)  Now, she claims that she is very limited to what she is able to do because she has very little energy, she had trouble concentrating, and she has trouble with her vision.  (T. 99.)  She stated that before GBS, she would get six hours of sleep a night, fix all of the meals, do the shopping and cleaning, and work for four to five hours a day.  (T. 100.)  After GBS, she sleeps 12-14 hours, takes three hours after waking to "wake-up," showers,

---

[2]        Under Social Security regulations, an individual who is younger than 50-years old is considered a "younger individual," while a person who is 50 to 54-years old is considered a "person closely approaching old age."  20 C.F.R. § 404.1563.  The Social Security Agency (Agency) takes into account a person's age at the time of the claimed disability.  For example, for a younger individual, the Agency considers that the claimant's age will not affect his or her ability to adjust to other work.  *Id.* For an individual closely approaching advanced age, however, the Agency considers that the claimant's age, "along with a severe impairment(s) and limited work experience may seriously affect [the claimant's] ability to adjust to other work."  *Id.*

dresses, cleans up the kitchen, rests for a while, sits at her computer, rests again, makes dinner, and then goes to bed. (*Id*.) She claims that she does not bake, shop alone, do needlework, go for walks, or read for fun anymore. (*Id.*) She explains that all of her friends "have disappeared" because she cannot do anything with them. (T. 101) She does make calls for a prayer chain and she continues to be the block club leader, as she had been for the past thirteen years. (*Id*.) She watches television about three hours a day. (T. 102.) She drives about once a week. (*Id.*) She does not do yard work, play games, take classes, or engage in exercise. (*Id*.) She occasionally walks her dog. (T. 114.) She rarely goes out except to church, the grocery store or to Al-Anon. (T. 115.)

Kevin Bozicevich, Bozicevich's husband competed a collateral pain questionnaire. (T. 105.) He stated that Bozicevich has fallen several times because of her diminished sense of balance. (T. 106.) He noted that she suffers from extreme fatigue caused by GBS and that this has "lead to the curtailment of most of her activities." (*Id*.) The GBS symptoms are aggravated by her "asthma, rheumatoid arthritis and the [chondromalacia] of the articular cartilage of the knee." (*Id*.) He noted that mediation helps relieve the pain, but does not lessen the impact of the affects of GBS. (*Id.*) He observed that her fatigue has affected her ability to function for any length of time, but that she can only perform tasks that are "simple and on short duration." (T. 107.) He stated that because of past difficulty in driving since the GBS, she drives rarely and only after careful consideration of her energy level. (*Id*.) In addition, he notes that she has difficulty talking when she becomes tired., which causes her much stress and embarrassment. (*Id*.) Her husband concluded:

> Prior to the onset of GBS, [s]he led a life that included a job she loved and involved an active, rich and rewarding circle of friends and family. The combination of all of the medical challenges has left Maureen with little ability to conduct anything

4

closely resembling a "normal" life.  Guillian-Barre Syndrome has had the most serious
effect on her.  Maureen has become for all intents and purposes a "shut-in".

(T. 107.)

Father John Dombrowski, O.F.M., also completed a Collateral Pain Questionnaire.  (T. 108.)

Fr. Dombrowski is Bozicevich's pastor and has been for the past seventeen years.  (*Id*.)  He states that

he sees her approximately once a week.  (*Id*.)  He states taht Bozicevich has difficulty functioning until

the afternoon and uses a cane to walk due to her lack of balance.  (T. 109.)  He noted that, because of

the GBS, she was "forced to retire . . . from the work she loved."  (*Id*.)  He observed that although she

comes to mass, she sits for the entire service, except for when she comes forward for Holy

Communion, when she walks with a cane and "holds onto each bench so that she won't fall."  (*Id*.)  He

explained that prior to the GBS, she was actively involved in the church, working as a church secretary,

serving on several committees, and singing in the choir, but that after GBS, she now rarely attends any

church meeting.  (*Id.*)  He stated that additionally, after GBS, she was only able to concentrate for an

hour or two in her job as secretary for the Parish Council meetings.  (T. 110.)

Jackie Bozicevich, Bozicevich's daughter, also submitted a Collateral Pain Questionnaire.  (T.

111.)  She described her mother's fatigue after GBS, and how this has affected her life.  (T. 111-13.)

She explained how her mother now needs help with shopping, does not eat out with either family or

friends, rarely leaves the house, does not drive unless it is a necessity and she is well rested, uses a cane

to walk to help with balance, and is unable to walk for long distances.  (T. 112.)  She explained that her

mother can only do two or three physical activities a week, such as cleaning the bathroom, and that she

must take time a couple days to rest between activities.  (*Id*.)  She noted that stress, humidity, and heat

increase her mother's symptoms of fatigue and that her mother gets very confused and frustrated when she gets tired.  (T. 113.)

B.      *Records from Treating Physicians*

On October 9, 1987, Bozicevich had arthroscopic surgery on her right knee.[3]   (T. 215.) During this procedure, the surgeon, Dr. Larry S. Stein, noted severe chondromalcia [4] of the patella, some minor chondromalacia of the femoral grove, and "moderately severe chondromalacia of the weight bearing surfaces of the medial femoral condyle and the tibial plateau." (*Id*.)  Dr. Stein also noted that there did not seem to be a mechanical cause for the chondromalacia and opined that the condition may represent cartilaginous degeneration. (*Id*.)  After the surgery, she was placed on a two week period of physical therapy.  (T. 214.)  Her knee continued to do well until she increased her stair climbing.  (*Id*.)  On November 30, 1987, the doctor noted a crepitation in her range of motion and also noted that Bozicevich would try to reduce her use of stairs.  (*Id.*)  On April 26, 1988, Bozicevich reported pain in her left knee with crepitation and grinding.  (*Id*.)  Dr. Stein explained that surgery was an option to relieve the pain, but she decided to delay surgery until the pain was worse.  (T. 213.)  In November 1988, the pain worsened to the extent that Bozicevich underwent surgery on her left knee. (T. 211.)  She underwent additional knee surgeries on January 12, 1990.  (T. 210.)  Bozicevich

---

[3]      "Arthroscopy is a method of viewing a joint, and, if needed, to perform surgery on a joint. An arthroscope consists of a tiny tube, a lens, and a light source. The device is inserted into a small incision and allows a surgeon to look for joint damage or disease. The device also allows the surgeon to perform reconstructive procedures on the joint, if needed." *MedlinePlus Medical Encyclopedia* at http://www.nlm.nih.gov/medlineplus/ency/article/003418.htm.

[4]      Chondromalacia is the softening and degeneration of the cartilage within the joint and may, in older patients, reflect an arthritic condition. *See id* at http://www.nlm.nih.gov/medlineplus/ency/article/000452.htm.

continued to experience varying degrees of pain an discomfort in her knees and received corticosteroid injections approximately every six to twelve months.  (*See* T.  198-210.)

On January 24, 1991, Bozicevich again had an arthroscopic surgery of the right knee.  (T. 156.) During this procedure, the surgeon, Dr. Stein, observed that there was significant chondromalacia throughout the joint.  (*Id*.)  The most significantly affected area was treated with arthroscopic shaving. (*Id*.)  On March 20, 1991, Dr. Stein noted that Bozicevich reported "throbbing pain" in her knee with walking or climbing.  (T. 217.)  He noted that her strength had improved, but was still limited, although activities of daily living were "attainable."  (*Id*.)           These surgeries were followed by aggressive rehabilitation programs.  (T. 207.)  Dr. Stein indicates throughout the treatment notes that Bozicevich experienced mild to severe bilateral patella crepitation.[5]  (*See* T. 198- 216.)  In June 1998, Dr. Stein noted that the periodic injections seemed to control the symptoms to the extent that further surgery should not be considered at that time.  (T. 201.)  He also noted her permanent residual from GBS and her use of a cane to walk.  (*Id*.)

On March 1, 1996, Bozicevich was admitted to HealthEast St. John's Hospital, in Maplewood, MN (HealthEast) after being seen in clinic by her primary care physician, Dr. Dale Duthoy.  (T. 164.)  She had experienced a sudden onset of heaviness and weakness in the arms and legs, with some tingling in her hands and feet.  (*Id*.)  She had lost all reflexes in the legs, had limited reflexes in her arms, and had weakness of wrist flexion and extension and hand grasp.  (*Id*.)  It is noted

---

[5]           Crepitation is characterized by "a grating or crackling sound or sensation (as that produced by the fractured ends of a bone moving against each other . . . )."  *MedlinPlus Medical Dictionary* (Merriam-Webster) at http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

that she needed assistance for safe walking.  (T. 164.)  Chest x-rays showed "evidence of some degree of emphysema or possibly chronic bronchitis or chronic asthmatic bronchitis."  (*Id*.  *See also* T. 168 (radiology report indicating same).)  On March 6, 1996, she was discharged by Dr. Duthoy with a diagnosis of Gullain-Barré Syndrome, acute; asthmatic bronchitis; and allergic rhinitis.  (T. 157.)  Dr. Duthoy noted in the discharge summary that Bozicevich's "muscle strength seemed to be returning" and that "she was gradually improving daily."  (*Id*.)  Dr. Richard T. Foreman wrote a discharge summary as well.  (T. 159-60.)  Dr. Foreman noted that, "during the course of her hospitalization, [Bozicevich] felt stronger in her arms but had persistent minimal weakness across her biceps and triceps an in her wrist extensors and hand grasp . . . but she could use her arms functionally."  (T. 160.)  He also listed Bozicevich's diagnosis as Acute Gullain-Barré Syndrome.

On the same day she was discharged, Bozichevich underwent a neurology examination by Paul Schanfield, M.D.  (T. 162-63.)  Dr. Schanfield noted she was much better walking than she had been a few days prior.  (T. 162.)  He additionally noted: "She can walk although it is somewhat wide-based and kind of wobbly.  She can walk independently but does better with a cane."  (*Id*.)

In June 1996, Dr. Foreman noted that Bozicevich had normal gait and good strength in her arms and hands.  (T. 235.)  He also noted that she had periodic vision blurring that was more pronounced when she was fatigued.  (*Id*.)  He observed that she was working ten to twelve hours a week.  (*Id*.)

On May 21, 1999, Bozicevich was admitted to the emergency room at HealthEast for treatment following a motor vehicle accident.  (T. 180.)  According to the notes, "she was not paying attention and went through a red light" when she was struck by another car.  (*Id*.)  She was diagnosed

8

with a chest wall contusion caused by the force from her seatbelt.  (T. 181.)

On November 20, 2000, Bozicevich was diagnosed with an upper respiratory infection and given Amoxicillin.  (T. 286.)  Dr. Duthoy noted that there was no evidence of exacerbation of asthma and that her lungs were clear.  (*Id*.)  On January 4, 2001, Dr. Duthoy wrote a prescription for a cane, noting that Bozicevich has used a cane chronically since GBS.  (T. 270.)  On September 5, 2001, Bozicevich was seen for mild exacerbation of asthma with sinusitis and probable acute bronchitis.  (T. 281.)  She was treated with Zithromax Z-pak.[6]  (*Id*.)  On November 26, 2001, she was prescribed amoxicillin for cold symptoms, including cough and fever.  (T. 280.)

On June 4, 2001, Bozicevich was seen by Dr. James E. George, M..D., regarding problems with her vision.  (T. 187.)  Bozicevich reported that she had trouble focusing her left eye.  Upon examination, Dr. George determined that she had a mild nuclear sclerotic cataract in both eyes, but that this was most likely not the cause of her symptoms.  (*Id*.)  He did see a "dark-appearing spot" in her left eye that raised the possibility of either a nevus or a subretinal neovascular membrane.  (*Id.*)  Based on this determination, Dr. George referred Bozicevich to a retinal specialist, Dr. Ed Ryan.  (*Id*.)  Dr. Ryan did not find a retinal connection with her vision problems.  (T. 186.)  On January 22, 2002, Bozicevich was again seen by Dr. George.  (T. 183.)  During this visit, Bozicevich reported that she was experiencing "episodes where her vision transiently [went] completely dark after she [had] been up to go to the bathroom in the middle of the night."  (*Id.*)  This problem with her vision did not happen

---

[6]      Zithromax Z-pak is in a class of medications called macrolide antibioticsis used to treat infections, such as  bronchitis and pneumonia, which are caused by bacteria. *MedlinePlus Drugs & Supplements* at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697037.html.

during the day.  (*Id*.)

On March 20, 2002, Dr. Duthoy stated that when Bozicevich "becomes ill with a virus she has extreme fatigue and generalized weakness and is unable to function to do housework or any other type of work at those times." (T. 274.)  He also noted that she has asthma which causes her to become short of breath at times and combined with her residual symptoms from GBS, causes her to develop additional fatigue.  (*Id*.)

On April 19, 2002, Dr. Thomas Jacques identified Bozicevich's vision problem as being caused by an irritation of the optic nerve.  (T. 218.)  Dr. Jacques began treating Bozicevich shortly after her diagnosis of GBS in 1996.  (T. 218-34.)  He observed that she had gone back to work after being diagnosed with GBS, but that after a year of trying to maintain "some type of employment" was unable to continues due to the extreme fatigue.  (T. 218.)  He noted that she had moved several years earlier into a one level home to accommodate her problems with her knees.  (*Id.*)  He also noted that she used a cane to assist in walking.  (*Id*.)  He stated that her asthma flare-ups and the arthritis in her knees affected her fatigue phenomenon from the GBS.  (*Id*.)  He noted that he had tried different medications to treat her optic nerve irritation, but that the medication added to her fatigue.  (T. 219.)  He explained that when she was on the medication for the irritation, her eyesight was not as blurry, but that the fatigue increased causing her eye to droop, impairing her vision.  (*Id*.)  He noted that her reflexes were present, that she had reasonable motor strength when tested at bedside, and that she could "ambulate with a single prong can with reasonable safety." (*Id*.)  He concluded:

> At this time I feel that her ability for competitive gainful employment is completely limited by her fatigue phenomenon from the Guillain Barre syndrome and the chronic arthritic knee problem and her asthma condition.  All three of these together

exacerbate her fatigue and make it impossible for her to either be retrained in some other occupation or continue in the future in a competitive gainful employment."

On May 21, 2002, Bozicevich was seen for acute sinusitis with mild asthma exacerbation. (T. 315.) She was prescribed Amoxicillin and told to increase her usage of Azmacort.[7]

In July 2002, Bozicevich was referred by Dr. Duthoy to a podiatrist, Dr. Troy A. Vargas, for complaints of left foot pain. (T. 300.) Dr. Vargas noticed a significant reduction in the arch support with degenerative joint disease. (T. 301.) He instructed Bozicevich to apply ice and take anti-inflammatory medication for the swelling and pain. (*Id*.) He also reviewed possible surgical intervention. (*Id*.) Bozicevich saw Dr. Vargas several more times regarding her left foot pain. (*See* T. 296-99.)

On December 21, 2002, Bozicevich walked for several blocks to attend a holiday party. (T. 311.) She appeared at the urgent care clinic the following day complaining of throbbing pain. (*Id*.) Dr. Bruce Leppink, the attending physician, suggested exercise and that she consider pool therapy. (*Id*.) Bozicevich explained that exercise in general was difficult and that her asthma was aggravated by the high humidity in pool areas. (*Id.*) She stated, however, that she would discuss with her primary care doctor the possibility of a new inhaler that might give her more relief in high humidity. (*Id*.)

On January 3, 2003, Dr. Duthoy completed a Medical Assessment of Ability to Do Work-Related Activities (Physical). (T. 322-28.) Dr. Duthoy stated that Bozicevich could lift ten pounds occasionally and three to five pounds frequently. (T. 322.) He also stated that she could stand and/or

---

[7]     Azmacort, "a corticosteroid, is used to prevent wheezing, shortness of breath, and troubled breathing caused by severe asthma and other lung diseases." *MedlinePlus Drugs & Supplements* at http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601123.html.

walk one-half hour total, with only five minute intervals, due to balance problems.  (T. 323.)  He noted

that she is subject to falls and uses a cane.  (*Id*.)  He stated that sitting was not affected.  (*Id.*)  He did

place restrictions on postural activities, noting that she should never climb, stoop, crouch, kneel, or

crawl and only rarely balance.  (*Id.*)  He found that she was not restricted in reaching, hearing, and

speaking, but was restricted in handling (due to her frequently dropping things); feeling (due to

decreased sensation in her hands); pushing/pulling (due to lack of strength); and seeing (due to problem

focusing in the left eye).  He placed restrictions on her environment with respect to heights, moving

machinery, temperature extremes, chemical, dust, fumes, humidity and vibrations.  (*Id.*)

On January 23, 2003, Bozicevich underwent an arthrodesis[8] of the first, second and third tarsal

metatarsla joints with a bone graft on the left foot.  (T. 356.)  The surgery went well and Bozicevich

was discharged from the hospital the following day.  (T. 343.)  She was given Percocet for pain, to be

taken as needed, and was instructed not to bear any weight on her left foot.  (*Id*.)

On January 29, 2003, Dr. Jacques also completed a Medical Assessment of Ability to Do

Work-Related Activities (Physical).  (T. 305-08.  *See also* T. 316-18 (a narrative explanation of

Bozicevich's physical limitations).)  Dr. Jacques stated that Bozicevich should rarely lift five pounds,

noting that she had poor grip strength and drops things heavier than five pounds.  (T. 305.)  He also

noted that due to problems with muscle fatigue, she cannot repetitively lift even five pounds.  (*Id*.)  He

stated that she could stand for five to ten minutes due to past knee surgery and arthritis.  (T. 306.)

---

[8]   Arthrodesis is "the surgical immobilization of a joint so that the bones grow solidly
together."  *MedlinePlus Medical Dictionary* (Merriam-Webster) at
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=arthrodesis.

There was no limitation on sitting.  (*Id.*)  She should never climb, balance, stoop, crouch, kneel, or crawl due to bad knees and "muscle fatigue which can affect balance."  (*Id.*)  Dr. Jacques also stated that the following physical functions were affected by Bozicevich's impairments:  repetitive reaching; handling (due to dropping objects and poor dexterity); feeling (due to tingling and numbness); repetitive pushing/pulling; seeing (due to blurry vision in left eye and vascular loop on the optic nerve); and speaking (words mixed up with fatigue).  (T. 307.)  There was no restriction on hearing.  (*Id.*)  He also stated that the following environmental restrictions were necessary in light of her impairments: heights (due to poor balance); moving machinery (due to poor balance and vision); temperature extremes (due to GBS); chemical, dust fumes and humidity (due to asthma); and vibrations (due to tingling caused by GBS).  (*Id.*)  There were not restrictions as to noise.  (*Id.*)

On February 21, 2003, Dr. Jacques submitted a letter to Bozicevich's attorney, clarifying his opinion as to Bozicevich's medical condition and her neurological disability.  (T. 330.)  He explained that he had participated in a one-year fellowship in neuromuscular diseases where he received special training in peripheral nervous system diseases, such as Gullain-Barré Syndrome.  (T. 331.)  He noted that Bozicevich's medical history was consistent for GBS.  (T. 330.)  He additionally noted that Bozicevich's complaints of fatigue were consistent with this diagnosis and that fatigue is a "symptom difficult to treat."  (*Id.*)  He observed that her testing results were consistent with the diagnosis of GBS and that her vision problem was caused by an abnormal left carotid siphon, which was not correctable by surgery.  (T. 331.)

C.      *Agency and Consulting Physicians*

13

On January 23, 2002, Donald Wiger, PhD., consulting for the Minnesota Social Security Disability Determination Services, completed a mental status evaluation of Bozicevich.  (T. 192.)  He noted that she walked slowly and used a cane.  (T. 194.)  He found that Bozicevich did not suffer from a depressive disorder, anxiety disorder, or amnestic disorder.  (T. 196.)   He concluded, based on his findings, that she was able to concentrate and understand directions, carry out mental task with reasonable persistence and pace, able to respond appropriately to coworkers and supervisors, and able to handle the mental stressors of the work place.  (T. 197.)  He noted in his conclusion that her basic concerns were primarily her fatigue as it related to her physical illness.  (*Id.*)  Although he concluded that she had no mental illness diagnosis, he assigned her a GAF sore of 60.[9]  (T. 196.)   Dr. Wiger stated that there were no signs of malingering or secondary gain.  (*Id.*)

On February 7, 2002. Dr. Aaron Mark, at the request of the Agency, reviewed Bozicevich's record and completed a Physical Residual Functional Capability assessment.  Dr. Mark described Bozicevich as "a worrier and complains about a good deal of fatigue."  (T. 256.)  He noted that although she had a long history of knee pain, "examination only showed crepitation and mild patella-femoral degeneration" (*Id.*)  He added that "[t]here is no real instability."  (*Id.*)  He stated that, although she uses a cane,  there was no evidence that she needs it and that her eye concerns do not appear serious.  (*Id.*)   Dr. Mark concluded that Bozicevich was able to occasionally lift 20 pounds and

---

[9]        The GAF scale is used to rate an individual's overall psychological, social, and occupational functioning.  American Psychiatric Association, *Diagnosis and Statistical Manual of Mental Disorders, Text Revision* 34 (4th ed. 2000).  The ratings are based on a 100 point scale.  *Id.* A rating of 60-51 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

frequently lift 10 pounds; could stand or walk for six hours in an eight hour day; could sit about six hours in an eight hour workday; and had an unlimited ability to push or pull.  (T. 249.)  He found that there were no postural limitations including climbing, balancing, stooping, kneeling, crouching, or crawling.  (T. 250.)  He also found that there were no manipulative limitation with respect to reaching, handling, or fingering and no visual limitations.  (T. 251.)  He found that there were no environmental limitations with respect to temperature extremes, humidity, fumes, order dusts, or gases but that she should avoid concentrated exposure to hazards such as machinery and heights.  (T. 252.)  He noted that, at the time of the review, he did not have access to any statements from the treating physicians regarding Bozicevich's physical capabilities.  (T. 254.)  These findings and conclusions were affirmed by Dr. Alan Suddard on May 10, 2002.  (T. 255.)

On February 11, 2003, Dr. Thomas Kuhlman, Ph.D., completed a psychiatric review technique form after reviewing the record and concluded that there was no medically determinable impairment. (T. 259.)  This finding was affirmed by Dr. R. Owen Nelson, Ph.D. on the same date.  (*Id*.)

## V.   TESTIMONY AT ADMINISTRATIVE HEARING

On February 4, 2003, an administrative hearing was held before ALJ Mary M. Kunz.  (T. 442.)  Bozicevich appeared and testified, as did Steven D. Bosch, a vocational expert, and Dr. Andrew M. Steiner, a medical expert.  Bozicevich was represented by counsel, James H. Greenman.

Bozicevich testified that she had begun working at the church in 1992.  She explained that she did a variety of secretarial responsibilities including acting as receptionist, preparing bulletins and newsletters, scheduling uses of the church's facilities, and assisting the minister in a variety of ways.  (T. 446-49.)  She stated that she had GBS in February 1996 and was off of work for approximately two

months.  (T. 450.)  She explained that she returned to work and worked for about one year.  (T. 462.)

She explained that during that time, she had never felt as exhausted her entire life.  (T. 462-63.)  She

stated that she had difficulty keeping up with the demands of the job because of fatigue.  (T. 450.)  She

testified that she would work at the church for a couple of hours and then go home to take a three or

four hour nap.  (*Id.*)  When she awoke from the nap, she would work at home on projects that she had

brought home with her from the church.  (*Id.*)  She explained how she would have her children help her

with some projects so that she could complete them on time.  (T. 464.)   She stated that, prior to GBS,

she had been able to work the required amount of time, between 20 and 25 hours a week, but that

after GBS, she was unable to work more than ten hours.  (T. 463-44.)  She testified that the church

had accommodated her medical condition by allowing her to work more from home, but she eventually

felt that she was unable to adequately perform her responsibilities because she was having trouble with

remembering dates and details and that she was having trouble talking coherently when she was

especially tired.  (T. 450, 464.)  She explained that she tried to continue working, that she had "pushed

and pushed and pushed," until one day she just sat down and cried because she was so overwhelmed

with what she needed to do and the time in which it needed to be accomplished.  (T. 463.)  She told

the ALJ that she had not looked for other employment because she was "waiting for the fatigue to pass,

and it hasn't happened."  (T. 450.)

Bozicevich testified that prior to being diagnosed with GBS, she had been "a very, very good

typist," typing 140 words per minute with no errors.  (T. 469.)  She also explained that she had been

able to play the piano fairly well.  (*Id.*)  She further explained that since she has had GBS, she is unable

to use her hands as well because she her ability to grasp things or to carry things has changed and that

she often drops things.  (*Id.*)

Bozicevich explained that she is not always sure what day it is and that she loses track of appointments.  (T. 451.)  She described how her symptoms fluctuate depending on how much sleep she gets and whether she is suffering from other illnesses such as colds or an asthma flare-up.  (*Id.*)  She stated that when she experiences these episodes, she sleeps for about fourteen hours and then naps off and on the following day.  (*Id.*)  These episodes occur three to four times a month.  (*Id.*)

Bozicevich further explained that has had difficulty with her knees due to arthritis and that she was recently experiencing problems with her foot due to the GBS.  (T. 452.)  She stated that she had ben told by her orthopedist to do less walking because the movement was destroying the knees.  (*Id.*)  She said that standing bothered her knees very much, but that sitting was "okay."  (*Id.*)  She also said that she had trouble standing and walking due to the extreme pain in her foot.  (T. 453.)  She estimated that she could stand for about five to ten minutes, but that after that amount of time she is in pain, fatigue sets in, and she loses her balance.  (*Id.*)  She also estimated that she could walk for approximately only five minutes because of problems with balance and fatigue.  (*Id.*)

Bozicevich explained that she also has problems with her eyes due to GBS.  She explained that because her left eye does not focus, fatigue sets in when she tries to read which makes her eyes worse.  (*Id.*)  She says this problems affects not only her reading, but also other projects that require "close work," like needlework or work on the computer.  (T. 454.)  She testified that she rarely drives and only when she is sure that she is well rested.  (*Id.*)

Bozicevich testified that she had tried to do some volunteer work as a recording secretary at her church following her quitting her job.  (454.)  She explained that she had tried to do some typing,

17

but that her arms would get "very, very heavy" and that it would take her a very long time to finish a project.  (*Id.*)  She stated that she quit doing the volunteer work because she felt she was not "giving them a fair assessment of what was happening at their meetings."  (*Id.*)

Bozicevich described a typical day during 1997 through September 2002 as sleeping for fourteen hours and then taking about four hours to "be conscious and clear."  (T. 455.)  During that time, she explained, she takes her medications, has something to eat like a piece of fruit and a bottle of water.  (T. 456.)  After about four hours, she would get the energy to get something more substantial to eat, like a microwave dinner.  (T. 457.)  She says that she eventually gets dressed.  (*Id.*)  She stated that she only takes a shower when she is "clear" because she does not want to fall.  (*Id.*)  She testified that on good days, she will clean a little and "think about dinner," but that there are days when she stays on the couch all day.  (*Id.*)  She explained that her husband helps her prepare dinner and that when he is gone she does not cook very often, but instead will order a pizza.  (*Id.*)

Bozicevich testified that sometimes goes to church, but only when she plans on not doing any activity before she goes and only if she feels that she has enough energy to safely get behind the wheel to drive.  (T. 458.)  She stated that when she does go to church, she does not participate in the service, except for receiving communion.  (T. 458-59.)  She explained that she often leaves right after communion.  (T. 459.)  She testified that she is the contact person for a prayer line for her church and that people call her with a prayer request.  (*Id.*)  She stated that she calls five women each week with the prayer requests and the these five call the remaining members on the list.  (*Id.*)  She explained that she does not read any more because it is too frustrating due to problems with her eyesight.  (*Id.*)  She also explained that she only occasionally watches movies (one every three or four months) because she

has trouble concentrating.  (*Id.*)  She told the ALJ that she has no side affects from her medication and that her medications for the most parts are very helpful.  (*Id.*)

Bozicevich explained, however, that the medications do not work when her asthma is aggravated or she is suffering from a virus or a cold.  (T. 460.)  She stated that she suffers from a cold or asthma approximately 20 days out of a month.  (*Id.*)  She testified that the other illnesses cause her symptoms of GBS to be exacerbated.  (*Id.*)  She described these symptoms to include tingling throat and numb lips, which make it difficult for her to eat of speak.  (*Id.*)  She stated that she has approximately five good days a month.  (T. 461.)  On these good days, she can clean the kitchen and do other chores around the house.  She explained, however, that if she does too much on her "good" day, she will have more problems the following day.  (T. 462.)

Dr. Andrew M. Steiner, the medical expert noted that Bozicevich had been treated for extremity weakness due to GBS in 1996, which has cleared.  (T. 474.)  He also noted treatment for foot and knee pain and reported blurred vision.  (*Id*.)  He also noted that asthma had been diagnosed. (*Id*.)  Upon questioning by the ALJ, Dr. Steiner agreed that there had been no objective testing for asthma, and thus concluded that is was not an established diagnosis.  (T. 475.)  Dr. Steiner testified that, absent any evidence of ongoing neurological loss, the described impairments would not meet or equal a listed impairments that would presume disability.  (*Id*.)  Based on a review of the record, he testified that Bozicevich would be able to perform work in the sedentary range, with limitations imposed by asthma.  (T. 476.)  He saw no evidence to place restrictions on vision ability.  (*Id*.)  He also stated that there was mention of Bozicevich use of a cane and that her treating physician had prescribed the use of a cane, but that he saw no medical need for its use.  (T. 476-77.)  He noted that fatigue was a

19

credibility issue and that there had been no actual measurement of fatigue.  (T. 477.)  He went on to

explain, however, that fatigue is "generally a difficult thing to measure anyway."  (*Id*.)  Nonetheless, he

concluded there was no object medical evidence that the cane was medically necessary.  (*Id*.)

The ALJ next posed a hypothetical to the vocational expert, Steven D. Bosch, based on

Bozicevich's age, education and work experience, with a medical history of GBS, with complaints of

ongoing pain and weakness; a medical history of osteoarthritic changes and arch weakness in the feet, a

medical history of degenerative changes in the knees and with surgeries for that, a history of blurred

vision, which has been possibly been attributed to optic nerve irritation; a history of asthma, such that

she would be limited to sedentary work, defined as lifting up to ten pounds occasionally and up to six

hours of sitting and two hours of walking or standing in an eight hour work day.  (T. 485-86.)  The

work limitations also included no repetitive operation of foot controls and an environment free of dust,

fumes, gases or pulmonary irritants.  The VE explained that a person like that described in the

hypothetical would be able to perform work such as Bozicevich had performed in the past, a church

membership secretary.  (T. 486.)  The ALJ then modified the hypothetical to represent an individual

with the additional limitation, based on fatigue and problems with concentration, of unskilled work.

(Id.)  The VE stated that a person under this hypothetical would not be able to perform the

Bozicevich's past relevant work, but would be able to perform several other jobs in significant numbers

within the economy, to include:  clerical sorting occupations with 1,500 to 2,000 jobs available; optical

assembly occupations with 3,000 such jobs in the sedentary level; and electronic assembly jobs at the

sedentary level with approximately 4,000 jobs.  (T. 486-87.)

## VI.   THE ALJ'S FINDINGS AND DECISION

On March 18, 2003, ALJ Kunz, issued her unfavorable decision denying Bozicevich disability insurance benefits.  The ALJ followed the sequential five-step procedure as set out in the rules.  *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a).  The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity [RFC][10] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines v. Apfel*, 149 F.3d 893, 894 - 95 (8th Cir. 1998) (footnote added).

Based on the above steps, the ALJ determined that Bozicevich has not engaged in substantial gainful activity since April 30, 1997, was severely impaired by a history of GBS, osteoarthritic changes and arch weakness in the left foot, a history of chondromalacia and degenerative changes in the knees with multiple surgeries, optic nerve irritation, and a history of asthma.  (T. 21.)  The ALJ found that none of Bozicevich's individual impairments, or a combination of impairments, met or equaled the requirements to be presumptively disabling.  (*Id.*)  The ALJ additionally found that Bozicevich's "testimony regarding her subjective symptoms and functional limitations was not fully credible due to significant inconsistencies in the record as a whole."  (*Id.*)

The ALJ next proceeded to determine Bozicevich's RFC.  The ALJ concluded that Bozicevich

---

[10]   A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations.  20 C.F.R. § 404.1545.

"retained the residual functional capacity to perform a modified range of sedentary work involving occasionally lifting up to ten pounds, standing and/or walking for two hours in an eight-hour workday, sitting for six hours in an eight-hour workday, not requiring repetitive operation of foot pedals, or exposure to dust, fumes, gases, or pulmonary irritants." (*Id.*)   Based on this RFC, Bozicevich's age, education and past work experience a s a membership secretary, the ALJ found that she was able to return to her past relevant work as a membership secretary. (T. 22.)  Accordingly, the ALJ found that Bozicevich was not under a disability as defined by the Social Security Act. (*Id.*)

**VII.  DISCUSSION**

   A.   *Standard of Review*

   This court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on a review of the entire record. *Haley v . Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the decision." *Id.* (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.* The court must additionally examine the record for evidence that detracts from that decision. *Id.*

   B.   *Analysis of Decision*

   The Eighth Circuit has long emphasized that social security benefits hearings are non-adversarial proceedings. *See Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).  The ALJ must "develop the record fairly and fully, independent of the claimant's burden to press his case." *Id.* "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record." *Id.* The goal

22

of the administrative process is that "deserving claimants who apply for benefits receive justice."

Battles v. Shalala, 36 F.3d 43, 44 (8th Cir.1994).

### 1. The Weight Given to the Treating Physicians' Opinions

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). Social Security Agency regulations mandate that the Agency shall give the treating physician's opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. "Generally, if a consulting physician examines a claimant only once, his or her opinion is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion." *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004); *see also Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001) (noting same). An ALJ may decline, however, to grant controlling weight to a treating physician's opinion if "the treating physician's opinion consists of nothing more than vague, conclusory statements." *Id.* (citing *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir.1996)).

Here, the ALJ declined to grant controlling weight or significant weight to Bozicevich's treating physicians' opinions noting that these opinions were not supported by medically acceptable clinical and laboratory diagnosis techniques and were not consistent with other substantial evidence in the record. (T. 20.) She also noted that these physicians, although long treating, only saw Bozicevich on a yearly basis. (*Id.*) The ALJ gave significant weight to Dr. Steiner, the testifying medical expert, who opined that Bozicevich could perform work in the sedentary range. (*Id.*) In addition, the ALJ considered the opinion of the state agency consulting physicians, who concluded that Bozicevich could perform a light

level of work.  (*Id*.)

The ALJ found that the diagnostic testing, as reported in the medical record is consistent with the diagnosis of GBS.  (T. 17.)  The ALJ concluded, however, that the incapacitating fatigue, a residual symptoms of GBS, is not supported by objective medical evidence or accepted laboratory diagnostic techniques.  (T. 20.)  The ALJ noted: "The opinions of Dr. Jacques and Dr. Duthoy are clearly based on the claimant's subjective allegations of incapacitating fatigue and weakness as when these physicians examined the claimant the treatment records document little in the way of objective findings."  (*Id*.) Thus, the ALJ discounted the treating physician's opinions with respect to limitations imposed by the fatigue and lack of balance.  (*Id*.)

It is documented in the record, however, that, generally, fatigue, and the extent a person suffers from  fatigue, are very difficult to detect through any type of objective medical testing.  *See* T. 419 (article by L.S.J. Merkies, M.D., *et al*, American Academy of Neurology, 53 *Neurology* 1648, *Fatigue in immune-mediated polyneuropathies* (November 1999), explaining the method of measuring fatigue is the Fatigue Severity Scale (FSS), a self-assessed questionnaire consisting of nine questions directed to the patient.).  *See also* T. 142 (article by Joel Steinberg, M.D., *Fatigue in Guillain-Barré Syndrome*, GBS Newsletter (Winter 2000-2001), stating that fatigue is "not readily identified during standard neurological testing," "[m]ethods to objectively quantitate or measure fatigue are wanting," and that "[f]or the time being, the best measure of a patient's fatigue will probably rely upon the patient's own description of [her] symptoms").  Dr. Steiner specifically acknowledged that fatigue was generally difficult to measure.  (T. 477.)  Thus, in this instance, the treating physician relied on the well accepted practice of measuring fatigue by relying on Bozicevich's self assessment of fatigue.

It is unclear what tests the treating physicians could have relied upon to objectively determine

Bozicevich's level of fatigue.   *See Reed v. Barnhart*, 339 F.3d 917, 922 (8th Cir. 2005.)  There is no

indication in the record that either doctor ever questioned Bozicevich's reports of fatigue.  Bozicevich

consistently reported fatigue in nearly every health care visit.  And these reports of fatigue are consistent

with well-reported residual effects of a diagnosis of GBS.   (See T. 142, 144 & 419.)  In addition, the

consulting psychologist concluded that there was no indication of malingering or secondary gains. (T.

196.)

        Furthermore, the Eighth Circuit has proclaimed that an ALJ's decision to discount or disregard

a treating physician's opinion will be upheld "where other medical assessments are supported by better

of more thorough medical evidence or where the treating physician renders inconsistent opinions that

undermine the credibility of such opinions." *See Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir.

2000).  Here, however, the ALJ did not rely on medical assessments that were based on better or

more thorough medical evidence.  Instead, the ALJ relied on the opinions of the testifying physician,

who had no previous contact with Bozicevich, and a consulting physician, who's opinion was derived

from a review of only part of the record.  Neither of these medical experts relied on medical evidence

that was better or more thorough than that relied on by Bozicevich's treating physicians.  In addition,

the opinion of Bozicevich's two treating physicians are consistent with statements made throughout the

years of treatment regarding Bozicevich's difficulties caused by extreme fatigue related to GBS.

        Finally, the ALJ should have taken into consideration Dr. Jacques position as a specialist in

diseases such as GBS.  *Singh*, 222 F.3d at 452 (quoting *Metz v. Shalala*, 49 F.3d 374, 377 (8th

Cir.1995)) ("The [ALJ] is encouraged to give more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a specialist." ).

Dr. Steiner graduated from the University of Minnesota in 1963 and is board certified in Physical

Medicine and Rehabilitation.[11]  (T. 46.)  Dr. Steiner expresses no specialized knowledge about persons

suffering from GBS.   Dr. Jacques, on the other hand, graduated from the University Medical School in

1985, is board certified in Psychiatry and Neurology, and completed a fellowship on Neuromuscular

Diseases in 1990, with special training in "peripheral nervous systems diseases, such as Guillain-Barre."

(T. 331 & 335.)  Thus, the ALJ should have weighted Dr. Jacques' opinion more heavily than Dr.

Steiner's opinion, based on Dr. Jacques' level of expertise in GBS.

Drs. Jacques and Dothuy have treated Bozicevich for an extended time.  The only inconsistent

evidence in the record are the opinions of consulting medical experts.  The opinions of consultants are

not considered substantial evidence.  *See Charles*, 375 F.3d at 783.  Therefore, the treating

physician's opinions are consistent with substantial evidence in the record.  Dr. Jacques has had

specialized training regarding disorders such as GBS.  Taking all of these factors into consideration, the

court finds that the ALJ should have given controlling weight to Bozicevich's treating physician's

opinions on her limitations caused by her severe fatigue.[12]

### 2.   The ALJ's Determination of Bozicevich's Credibility

---

[11]     Physical Medicine and Rehabilitation is "a medical specialty concerned with diagnosis, evaluation, and management of persons of all ages with physical and/or cognitive impairment and disability."  The American Board of Physical and Rehabilitative Medicine, *Overview* at http://www.abpmr.org/about/index.html.

[12]     It should also be noted that the physician's opinions are not vague or conclusory.  Dr. Jacques cites specifically to physical causes of each described limitation in the evaluation.  (*See* T. 305-08.)  Dr. Duthoy does the same.  (T. 322-28.)

In determining the credibility of a claimant's subjective complaints, the ALJ looks to several factors as set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).  These factors include: daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  *Id.* at 1322.  These factors must be considered in the light of "the claimant's prior work record, and observations by third parties and treating and examining physicians."  *Id.*  "[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them."  *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005).  An ALJ may, however, discount a claimant's subjective complaints if the complaints are inconsistent with the record as a whole.  *Id.*  An ALJ who determines that a claimant's subjective complaints lack credibility must "make an express credibility determination explaining his reasons for discrediting the complaints."  *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995).  The court gives deference to an ALJ determination to discredit a claimant's credibility if the ALJ has provided good reasons to for doing so.  *See Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).

Here, ALJ Kunz determined that Bozicevich's complaints of fatigue and lack of balance were not credible.  (T. 17.)  The ALJ supported this determination by her evaluation of Bozicevich's subjective complaints in relation to her daily activities.  She also explained that Bozicevich's self-reported daily activities were inconsistent with a finding of disability.  The ALJ noted that:

> "[T]hough the activities had to be performed slowly and over an extended period of time, the claimant alleged she was able to adequately take care of her own personal hygiene, she maintained a stable residence, used a microwave to prepare meals, and was able to plan and begin dinner.  The claimant managed her own medications, remembered to eat meals, and when her husband was out of town she was able to stay alone and adequately care for her needs.  Ms. Bozicevich reported that with her husband's assistance she went shopping, did laundry, and paid bills.

(T. 19.)  Based on those factors, the ALJ concluded that Bozicevich "was able to complete a broad

range of activities in an independent and sustained, appropriate manner which is inconsistent with

allegations of disabling symptoms and inability to perform gainful activity." *Id.*

The Eighth Circuit has repeatedly admonished the Commissioner for placing too great of weight

on a claimant's ability to do simple household chores and activities when determining a claimant's ability

to do competitive full time employment.  *See Reed*, 339 F.3d at 923.  In addition, the Eighth Circuit has

instructed that an ALJ must consider the "quality, frequency, and independence of the claimant's

activities" and the "claimant ability to sustain these activities over a period of time"  *Reed*, 399 F.3d at

924.  The ALJ notes that Bozicevich needs the assistance of her husband when doing errands outside

the home such as shopping and even activities within the home such as laundry and paying bills.  (T.

19.)  There is no supporting evidence in the record to demonstrate that Bozicevich could independently

sustain any type of activity for an extended period of time.  On the contrary, her own reports of daily

activities and reports from her husband, daughter and pastor are consistent with Bozicevich's

complaints of disabling fatigue.  Uncontroverted evidence in the record shows that Bozicevich cannot

do the activities that she once enjoyed.  *See Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

In addition, being able to use a microwave, remembering to take medication, needing help doing

shopping, and helping pay the bills do not support a finding that Bozicevich has the ability to perform

activities that would be required by competitive full-time employment.  *See Banks v. Massanari*, 258

F.3d 820, 832 (8th Cir. 2001) (stating that watching television, visiting friends, and going to church do

not indicate that a claimant is able to work full time in our competitive economy); *Singh*, 222 F.3d at

452-53 (noting that "staying around the house, watching T.V., needing help to shave, being unable to sit

through an entire movie" were consistent with the claimant's complaints of disabling pain); *Kelley*, 133 F.3d at 589 (stating that daily activities of taking care of daily needs and needing help shopping and housework are not substantial evidence that the claimant has the capacity to perform substantial gainful activity. *See also Reed*, 399 F.3d at 924 (stating that "a claimant need not prove that she is bedridden or completely helpless to be found disabled").

The ALJ also discredited Bozicevich's complaints about fatigue and claims of needing a cane to ambulate based on the lack of objective medical evidence in the record supporting the medical need for a cane.  (T.18.)  The ALJ notes the testimony of Dr. Steiner and the opinion of Dr. Mark, the state medical consultant, indicate that there is no documented medical necessity for the use of a cane.  (*Id.*) On March 6, 1996, Dr. Schanfield noted: "[Bozicevish] can walk although it is somewhat wide-based and kind of wobbly.  She can walk independently but does better with a cane."  (T. 162.)  On January 4, 2001, Dr. Duthoy wrote a prescription for a cane, noting that Bozicevich has used a cane chronically since being diagnosed with GBS.  (T. 270.)  On April 19, 2002, Dr. Jacques noted that Bozicevich uses a single prong cane.  (T. 218.)  There is no mention of Bozicevich being able to walk safely without the cane or any indication by any health professional that observed Bozicevich that indicated that a cane was not needed.. *Cf. Ellis v. Barnhart*, 329 F.3d 988, 994 (8th Cir. 2005) (stating that ALJ could discredit the claimant's claims of needing a cane to walk when one physician opined that the claimant was able to "walk briskly" without the cane, the cane was not medically necessary, and the claimant "had no problem getting around the examining room").

The ALJ also points to Bozicevich's use of medication as a factor to indicate that her subjective complaints are not credible.  The ALJ notes that there have been no adverse reactions to the use of

29

medication, only occasional changes in the medication, and reported improvements due to the use of the medication.  (T. 19.)  The ALJ concludes that "the record does not establish that the claimant is unable to utilize prescriptive medication to alleviate the severity of her symptoms."  (*Id*.)  There is no indication in the record, however, that medication has been used to treat Bozicevich's symptom of fatigue.  There is evidence in the record that indicates that there is no treatment for severe fatigue, except rest.  Thus, the successful use of medication to treat Bozicevich's complaints of pain and lack of concentration do not support the ALJ's reasoning that this should discredit Bozicevich's complaints of continuing disabling fatigue.

The court finds that the ALJ failed to provide good reasons for discrediting Bozicevich's subjective complaints.  Accordingly, the court declines to grant deference to the ALJ's decision to discredit Bozicevich's subjective complaints.

### 3.   The Hypothetical Posed to the Vocational Expert

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Goff*, 421 at 794 (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir.2001)).  If the hypothetical fails to include all of the claimant's limitations as supported by substantial evidence in the record, a vocational expert's testimony, based on that hypothetical, cannot be considered substantial evidence.  *Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001).  The hypothetical posed to the vocational expert, and relied upon by the ALJ, failed to include all of the limitations as indicated by Bozicevich's treating physician's and indicated by her subjective complaints.  Consequently, the ALJ's conclusion that Bozicevich could perform her past relevant work is not based on substantial evidence.

## VIII.   CONCLUSION AND RECOMMENDATION

The court finds that, based on a review of the record, the ALJ's decision that Bozicevich could perform her past relevant work is not based on substantial evidence in the record.  Proper consideration of her treating physician's opinions as well as proper consideration of her subjective complaints provide substantial evidence that Bozicevich is unable to perform her past relevant work as well as any other substantial gainful employment.  "If the record contains substantial evidence supporting a finding of disability, a court may reverse and remand for an order granting benefits to the claimant." *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000) (citing *Andler v. Chater*, 100 F.3d 1389, 1394 (8th Cir.1996)).   Accordingly, the court **recommends** that Bozicevich's Motion for Summary Judgment [Docket No. 11] **be granted** by an outright awarding of benefits and the Commissioner's Motion for Summary Judgment [Docket No. 14] **be denied.**

Dated: January 30, 2006

s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

### NOTICE

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **February 16, 2006**.